UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>v.<br><br>FLAVIO DANIEL MEZA-GONZALEZ,<br><br>                              Defendant. | Case No.:  17-cr-2552-GPC<br><br>**ORDER DENYING MOTION TO**<br>**SUPPRESS**<br>**[DKT. NO. 61]** |

On February 16, 2018 Defendant Flavio Daniel Meza-Gonzalez filed a motion requesting (1) suppression of his post-arrest statements; (2) an evidentiary hearing; and (3) severance of certain counts. Dkt. No. 61.  On March 27, 2018, the United States filed a response to this motion. Dkt. No. 66.  Defendant filed a reply on April 18, 2018. Dkt. No. 69.  On April 25, 2018, the Court commenced an evidentiary hearing as to the motion to suppress.  Dkt. No. 71.  The Court heard testimony from U.S. Border Patrol agents Garduño and Meyer.  Dkt. No. 73.  The evidentiary hearing was continued for a second day on May 25, 2018. Dkt. No. 75.  The Court heard testimony from U.S. Border Patrol agents Meyer and Cuevas.  Dkt. No. 80.  On June 4 and June 8, 2018, the parties filed supplemental briefing to address whether a further evidentiary hearing was necessary. Dkt. Nos. 77-78.  On June 27, 2018, this Court held a third day of evidentiary hearings on the motion to suppress. Dkt. No. 81.  The Court heard testimony from desk officers

Fabian Carbajal and Dario Povoli, as well as testimony from Diana Ibarra, a member of the Prosecutions Unit. Afterwards, the parties were given the opportunity to submit further briefing to address the evidence raised in the hearings. Neither side elected to file supplemental briefing.

Having considered the filed papers, the evidence presented at the evidentiary hearing, and the applicable law, the Court will **DENY** Defendant's motion to suppress and find that Defendant has not shown unreasonable delay in presentment and that the statements were made voluntarily.

## I. INDICTMENT

On August 30, 2017, Mr. Meza-Gonzalez was charged in an eight count indictment with one count alleging a violation of section 1324(a)(1)(A)(i) and (B)(iv)—bringing in aliens resulting in death and seven counts alleging violations of section 1324(a)(2)(B)(ii)––bringing in aliens without presentation for financial gain. Dkt. No. 28 at 1-4.

## II. FACTUAL BACKGROUND

On July 31, 2018, Mr. Meza-Gonzalez crossed into the United States together with seven other individuals. Dkt. No. 66-11 at 32. One of the group members, Mr. Ramirez-Diaz, who was married to Ms. Mondragon, passed away during the subsequent trek. Ms. Mondragon recalled that during the trek her husband began showing signs of exhaustion. Dkt. No. 66-5 at 3. Mr. Ramirez-Diaz suffered from hypertension and possible anxiety. *Id.* Mr. Ramirez-Diaz's exhaustion became apparent to other members within the group, who offered to carry the couple's backpacks while he recovered. *Id.* The situation rapidly worsened as Mr. Ramirez-Diaz collapsed, began to loudly argue by himself, and had a fast beating heart and abnormally hot body temperature. *Id.* After Ms. Mondragon attempted to administer a pill, Mr. Ramirez-Diaz vomited and began convulsing. *Id.* Mr. Meza-Gonzalez attempted to call emergency rescue services, but was unable to call due to poor phone signal. *Id.* at 3-4. He instructed Ms. Mondragon to walk up the canyon to make the call herself. She made the call, was placed on hold, feared the phone would run out of

battery, hung up, and returned to care for her husband. *Id.* After half an hour, the group informed her that they would be leaving her and her husband behind. *Id.* Mr. Meza-Gonzalez reassured Ms. Mondragon that she and her husband would be rescued as a helicopter had been observed flying overhead. Ms. Mondragon stated that around 5:00 p.m. she realized that her husband had died. *Id.* at 4. She slept that night near her husband's body. *Id.* In the morning, she once again contacted an emergency operator. In the meantime, Ms. Mondragon had discovered an unusual rock formation forming the letter "H" and realized it had been created to be visible from the sky. *Id.* She reported the formation to the emergency operator and was rescued less than an hour later. *Id.* Afterwards, Ms. Mondragon was presented with a photographic line-up consisting of six pictures and positively identified the group guide as Mr. Meza-Gonzalez. *Id.*

Mr. Meza-Gonzalez and the remainder of his group were first spotted by border patrol at approximately 5:45 am on August 1, 2018. Dkt. No. 66-1 at 2. The border patrol found the group approximately 8.8 miles east of the Otay Mesa Port of Entry known as the Brown Field area of operations. *Id.* Due to the steep decline of the area, the agents walked the six members of the group uphill for an immigration inspection. Dkt. No. 66-2 at 2. An inspection and pat-down was conducted and the group's belongings were searched. Dkt. No. 66-1 at 2. At approximately 6:00 AM, Border Patrol agent Clint Thielemann placed all six individuals under arrest and arranged transportation to the Brown Field Border Patrol station for processing. *Id.*

### A. Booking Process

Agent Garduño testified that it takes approximately 30 to 45 minutes for an agent to transport the group of six individuals from the area they were arrested in—a rugged mountainous terrain known as Zone 22—to the nearest road. Vol. I at 18. Next, it takes approximately 45 minutes to an hour to transport the group from the road to Brown Field Station for processing. *Id.*

Detained aliens brought to the station are patted-down for weapons, their property is tagged, and they are placed within a cell. Vol. I at 12-13. The border patrol agents

provide "zone intel" to the desk officer, who then inputs information about the subject and the incident into the computer. Vol. I at 13.  Once the information has been inputted, processing agents begin rolling fingerprints of each undocumented alien on an electronic fingerprint machine. Vol. I at 13.

Brown Field Station maintains four electronic fingerprint machines. Vol. I at 13. The fingerprints of aliens are used by desk officer to obtain any available further immigration or criminal history. Vol. I at 13-14.  During this process several databases are checked, including the SDlaw criminal history database and PCQS immigration databases. Vol. I at 45-47.  In Section 1324 cases, the Intelligence department makes the ultimate disposition recommendation for a 1324 case. Vol. III at 282.  Agent Garduño estimated that the entire booking process for six aliens arriving at the station simultaneously would take, at a minimum, four to five hours. Vol. I at 16.

## B. Post-Booking Interviews

As an ASID Agent, Agent Garduño was tasked with determining whether any foot guides were present in the group.  Vol. I at 14.  Agent Garduño interviewed several of the individual members of the group to ascertain whether a foot guide had been present. Vol. I at 18-19.   Once a foot guide is suspected, the foot guide is separated from the group and the agent begins the formal interview process. Vol. I at 19.

## C. First Interview

Agent Garduño and Agent Gregory Smith interviewed Mr. Meza-Gonzalez in an interview room at approximately 12:41 p.m.[1]  The agents informed Mr. Meza-Gonzalez that he would be charged with a crime and read him *Miranda* rights and warnings. Dkt. No. 66-10 at 9-10.  Mr. Meza-Gonzalez indicated he understood his rights and was willing to waive them.  The agents questioned Defendant about his citizenship, his prior removals from the United States, and the circumstances of the latest illegal entry. Dkt. No. 66-10 at

---

[1] The Brown Field Patrol Station contains two usable interview rooms, with the third room currently utilized as an office.  Vol. I at 21-22.

13-16. Mr. Meza-Gonzales stated that he intended to go to Los Angeles, California. Dkt. No. 66-10 at 17. Mr. Meza-Gonzalez did not admit during the initial interview that he had been the foot guide. Vol. I at 22. At the end of the interview, the agents informed Mr. Meza-Gonzalez that he had been arrested for the illegal smuggling of approximately five undocumented aliens and provided him the option to identify any material witnesses that could provide information favorable to him. Dkt. No. 66-10 at 19-20. Mr. Meza-Gonzalez identified a man with big lips, dark skin, and a moustache. Dkt. No. 66-10 at 21.

At the time of this interrogation, Agent Garduño did not know that Ms. Mondragon and her deceased husband had been part of the group that Mr. Meza-Gonzalez had been leading. Vol. I at 22. After Defendant's interrogation, Agent Garduño learned from Ms. Mondragon that she and her deceased husband had been part of the larger group that had been led by Mr. Meza-Gonzalez. Vol. I at 20-22. Other members of the group also stated that Ms. Mondragon and her husband had been part of the group. Vol. I at 23. Agent Garduño testified that discovery that the deceased was associated with this group was important information that needed to be relayed to his supervisor because it changed the situation. Vol I. at 94.

Agent Meyer, a member of the Station Intelligence Team, testified that he first became involved around 1:30 PM after it had already been determined that the case involved a death. Vol. I at 106. The Station Intel Team became involved in the investigation because it was now an extraordinary case as a result of the death. *Id.* It took approximately 1.5 hours for the members of the Station Intelligence Team and one member of the Homeland Security Investigations team to gather together. A half-hour meeting was held to discuss the interview plan, assign reports, assign manpower, assess resources, set guidelines, and ultimately create an investigative plan. Vol. I at 108-109; Vol. II at 214.

### D. Afternoon Interviews

In order to positively identify the actual foot guide in the group, it was decided to interview Ms. Mondragon first, followed by the material witnesses. Vol. I at 109. The agents that performed the interviews were fluent Spanish speakers, who understood

colloquialisms and slang better than a regular agent.  Vol. I at 110.  Some time was spent waiting for the fluent Spanish speakers to arrive, one of whom was Agent Cuevas.  Vol. I at 111, Vol. II at 216-217.

Ms. Mondragon was interviewed at approximately 5:23 pm. Vol. II at 171.  Agent Cuevas was assigned to interview Ms. Mondragon. Vol. II at 204.  Prior to the interview, Agent Cuevas spent about two hours doing research, including a review of the initial biographical interview and agency records, and developing a line of questioning. *Id.* at 205. Agent Cuevas believes his Spanish is better than that of Agent Meyers and testified that his Spanish speaking abilities were important because he was "comfortable speaking about delicate issues in Spanish appropriately," such as the recent death of Ms. Mondragon's husband. Vol. II at 227-28.  Agent Cuevas' interview discussed the circumstances that led to the death of Ms. Mondragon's husband. Vol. II at 228.

Subsequently, the material witnesses were also interviewed.  From photo lineups, these witnesses identified Defendant as the foot guide, and Ms. Mondragon and the deceased as members of the group.  *See* Dkt. No. 66-4 at 3 (interview with material witness Alvarez); Dkt. No. 66-6 at 2-3 (interview with material witness Amaya); Dkt. No. 66-7 at 2 (interview with material witness with redacted personal identifying information).

At approximately 7:35 p.m., Agent Cuevas and another agent interviewed Defendant. Vol. II at 218.  The agents repeated the *Miranda* warnings and Defendant once again waived these rights and elected to speak with the agents. Dkt. No. 66-11 at 6-8. Agent Cuevas confirmed that Mr. Meza-Gonzalez had been previously informed that the government was considering prosecuting defendant as a smuggler. *Id.* at 9.  Initially, Defendant denied being a guide and stated that he was in the construction business.  *Id.* at 9-10.  After further questioning, he admitted to guiding the undocumented aliens.  *Id.* at 18.  Defendant also admitted to previously guiding a group by himself and that he was guiding this group by himself because he felt a helper was not necessary.  *Id.* at 18-19. Defendant stated that he was being paid one thousand dollars per alien.  *Id.* at 20-21. Defendant also described a three hundred dollar turf tax paid to "la plaza." *Id.* at 21-22.

Defendant provided the agents with logistical information about the crossings including descriptions of the rope ladder system, frequency of crossings, and crossing location. *Id.* at 27-32.

Agent Cuevas proceeded to ask questions about the deceased and his wife. Mr. Meza-Gonzalez admitted that the deceased had gotten sick during the trek and had begun throwing up after about seven hours of hiking. *Id.* at 32-33. He stated that there were nine members in the group including himself and the eight aliens. *Id.* at 32.[2] Mr. Meza-Gonzalez stated that Ms. Mondragon had attempted to call a helicopter by dialing 911 on his cell phone. Mr. Meza-Gonzalez stated that he and the rest of his group waited forty minutes before leaving Ms. Mondragon and her husband. *Id.* at 34. Defendant was not aware of what ultimately happened to Ms. Mondragon and the deceased. *Id.* at 39. After a discussion about the logistics of how he was paid, the agents informed Mr. Meza-Gonzalez that Mr. Ramirez-Diaz had passed away and that Ms. Mondragon had spent the night with his body. *Id.* 43-46. Upon learning this news, Mr. Meza-Gonzalez reacted by sighing loudly and lowering his head toward the interview table. Dkt. No. 66-9, "Meza 1.wmv," at 30:00-31:00. Mr. Meza-Gonzalez stated that there were many risks that one can take. *Id.* at 47. The agents told Defendant that the investigation of his crime was ongoing. *Id.* at 51. At the end of the interrogation, the agents informed Defendant that he would be detained to await trial, and that the earliest he would be sent to the detention center would be the morning of August 2, 2018. *Id.* at 54-55.

### E. Prosecutions Unit

Agent Meyer testified that Mr. Meza-Gonzalez was not immediately brought for presentment because of the many hours of work necessary to put together a 1324 case. Vol. II at 186-87. He stressed the importance of making sure all statements from the material witnesses had been taken. *Id.* at 187. The final step between being interviewed

---

[2] Later, Mr. Meza-Gonzalez stated that there were eight individuals, including himself. Dkt. No. 66-11 at 45.

17-cr-2552-GPC

and being taken downtown is for the desk officer to organize transportation, for Prosecutions to be notified, and for the US Attorney's Office to approve the case. Vol. II at 189-190. A person who is suspected of committing a crime can be transported to federal custody only after the prosecutions unit has informed the border patrol agents that the U.S. Attorney's office will take the case. Vol. II at 192. A booking window at the MCC also has to be secured prior to arraignment. Vol. II at 190.

Agent Ibarra, a member of the Prosecutions Unit, testified that her team takes phone calls, runs record checks, and serves as a support unit for San Diego sector border patrol stations. Vol. III at 297. Prosecutions team members provide guidance as to policy and law and make sure that administrative and criminal cases are "complete and correct." *Id.* Records checks performed by the Prosecutions team are more extensive than those performed at the border patrol station by the desk officer. Vol. III at 299. This can include conviction documents from the PACER system and the PCQS database—a system that was not commonly used by station agents at the time of Mr. Meza-Gonzalez's arrest. Vol. III at 299-300. Agent Ibarra testified that 1324 cases are a "long, complex process" and that once they are informed by the border patrol agents the Prosecutions Unit will begin to prepare court documents and run checks. Vol. III at 300. She testified that the identification of a foot guide was necessary for a 1324 prosecution. Vol. III at 337. Agent Ibarra did not recall when the Prosecutions Unit first received a call about Defendant's case. Vol. III at 308. Agent Ibarra helped prepare the detainer form, one of the court forms that must be prepared in advance of a prosecution. Vol. III at 315-16. Furthermore, she testified that a 1324 prosecution would require a significant amount of time and would often take more time than a ten-hour shift. Vol. III at 339-340.

The ultimate prosecution decision is made after the court officer in the Prosecutions Unit presents the 1324 case to the duty prosecutor at intake. Vol. III at 320-21.

### F.     MCC

Agent Ibarra also testified that an impediment to immediate presentment to a magistrate judge was securing a booking window with the MCC. Vol. III at 328.

Prosecutions is responsible for obtaining the window at the MCC. *Id.* at 329. On August 1, 2017, border patrol had to take individuals to the MCC prior to their arraignment. Vol. III at 329-330. The MCC has three slots—9:00 AM; 12:30 PM; and 5:30 PM. Vol. III at 333. Individuals brought in during the 9:00 AM and at 12:30 PM MCC booking windows could be arraigned the same day. *Id.* In this case, Prosecutions called the MCC at 2:40 PM on August 1, 2017. Vol. III at 344. At that time, the MCC provided the first available window at nine o'clock the following day. Vol. III at 346.

### G. Conditions

The border patrol regularly maintains a subject activity log which notes the approximate times at which detainees are fed and the times at which general welfare checks are performed. Vol. I at 124-25. A printout from March 22, 2018 shows entries related to Defendant on August 1, 2017. Vol. II at 179.[3] The activity log shows that Mr. Meza was provided with a hot burrito on August 1, 2017 at 7:56, 10:38, 16:30, 19:15 and at 00:55, and 6:54, on August 2, 2017. Vol. I at 126; Ex. 4. These burritos are frozen and are heated in a microwave prior to being served. Vol. II at 183. Furthermore, throughout the day, Defendant was also provided with juice and/or crackers. Vol. III at 270; Ex. 4. Border patrol officers are required to provide food to adults every six to eight hours. Vol. III at 273. Detainees are offered food as soon as they arrive at the station regardless of time. Vol. III at 274.

The desk officer also checks the temperature of a room by using a temperature gun and comparing the temperature on a gun to certain temperature guidelines. Vol. III at 257. The desk officer also visually checks the temperature of the holding rooms by looking at a thermostat box located near the desk officer area. Vol. III at 257-258. Agent Carbajal, who had been a desk officer for two years, testified that the temperature had never been outside

---

[3] The activity log indicates only the name of the desk officer; the actual agent who provides the food and conduct the welfare check is not recorded. Vol. III at 270. Agent Pavoli testified that late entries would be flagged in the system. Vol. III at 361.

17-cr-2552-GPC

of the temperature guidelines. Vol. III at 255. Agent Pavoli testified that the temperature range was 66 to 80 degrees. Vol. III at 364. Agent Meyer testified that the temperature of the cells was comfortable and was not colder than the other areas of the station. Vol. II at 196-97. Further, disposable "aluminum space blankets"—made of a mylar-type material––are provided if detainees are cold. Vol. II. at 178; Vol. III at 264-65. Agent Cuevas testified that Defendant was asleep when he went to retrieve him for his second interrogation. Vol. II at 210. Agent Cuevas woke him up, and offered him food and water. *Id.*

### III. Motion to Suppress: Presentment

#### A. Legal Standard

Federal Rule of Criminal Procedure Rule 5 states that "[a] person making an arrest within the United States must take the defendant *without unnecessary delay* before a magistrate judge." Fed. R. Crim. P. 5. The *McNabb-Mallory* rule "generally render[s] inadmissible confessions made during periods of detention that violat[e] the prompt presentment requirement of [Rule] 5(a)." *Corley v. United States*, 556 U.S. 303, 303 (2009). Consequently, "an arrested person's confession is inadmissible if given after an unreasonable delay in bringing him before a judge." *Corley*, 556 U.S. at 306 (discussing *McNabb v. United States*, 318 U.S. 332 (1943) and *Mallory v. United States*, 354 U.S. 449 (1957)). In response to the application of *McNabb-Mallory*, Congress enacted 18 U.S.C. § 3501(c) which provides a six-hour "safe harbor" period during which a confession will not be deemed inadmissible solely because of delay in presentment to a magistrate. *United States v. Valenzuela-Espinoza*, 697 F.3d 742, 748 (9th Cir. 2012).

In *Corley,* the Supreme Court reaffirmed the post Section 3501(c) validity of the *McNabb–Mallory* rule. 556 U.S. at 322. The Court concluded that Section 3501(c) "modified *McNabb–Mallory* without supplanting it." *Id.* The Court described the procedure for applying *McNabb–Mallor*y in light of § 3501(c):

> [A] district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was reasonable

considering the means of transportation and the distance to be traveled to the nearest available magistrate). If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was made voluntarily and the weight to be given it is left to the jury. If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, the confession is to be suppressed.

*Id.* (internal quotation marks and alterations omitted); *see also United States v. Garcia–Hernandez,* 569 F.3d 1100, 1105 (9th Cir. 2009) (describing *Corley*'s two-part test). The Supreme Court reiterated that "delay for the purpose of interrogation is the epitome of 'unnecessary delay.'" *Corley*, 556 U.S. at 308.

### B.    Six-Hour Rule

The parties do not dispute that Mr. Meza-Gonzalez was first interrogated outside of the six-hour window. The facts show that Mr. Meza-Gonzalez was arrested[4] around 6:00 A.M. and that his first interrogation did not take place until approximately 12:41 PM. *See* Dkt. No. 66-1 at 2; Dkt. No. 66-10 at 5. Accordingly, the Court evaluates whether the delay in this case was "unreasonable." *See United States v. Pimental*, 755 F.3d 1095, 1101 (9th Cir. 2014) (where § 3501(c) safe harbor did not apply, the analysis turns to whether the delay was "unreasonable or unnecessary" under *McNabb-Mallory*).

### C.    Unreasonable Delay - Burden of Proof

As a threshold matter, the parties have previously disagreed as to which party bears the burden of proof of showing a presentment violation. Defendant argues that the government bears the burden of proof and persuasion to establish that the delayed

---

[4] Defendant also asserts that the border patrol misleadingly reported the time of arrest as 6:00 A.M.—instead of 5:45 A.M. when the group was first spotted—in an attempt to avoid Chief Judge Moskowitz's order in *United States v. Lauina*, 2016 WL 1573195, at *6 (S.D. Cal. Apr. 18, 2016), which requires the Government to provide a list to the duty Magistrate Judge and Federal Defender of all persons arrested before 6:00 a.m. each day. Under the facts as presented, the border patrol first saw the group via infrared scope at 5:45 a.m. and did not place the group under arrest until approximately 6:00 a.m. *See* Dkt. No. 66-1. Thus, listing an arrest time of 6:00 a.m. is factually accurate, particularly where Defendant has not presented any evidence at these extensive evidentiary hearings to suggest the arrest was made at an earlier time or that there was an attempt to evade the *Lauina* list.

17-cr-2552-GPC

interrogation was reasonable and necessary. Dkt. No. 77 at 2. According to Defendant, the Ninth Circuit has not clearly decided which party carries the burden of showing whether a delay is unreasonable under *Corley*. Defendant argues that the prosecution is in the best position to provide facts that are both reasonable and necessary. While Defendant's position is well reasoned, the Court concludes that the weight of the applicable case law establishes that the burden is on the Defendant to show unreasonable delay.

In *United States v. Van Poyck*, 77 F.3d 285, 288 (9th Cir. 1996), the Ninth Circuit clearly stated that the "defendant bears the burden of proving grounds for exclusion" in the context of a *McNabb-Mallory* violation. The *Van Poyck* court addressed substantially the same issue—whether the statements made should be excluded as a result of pre-arraignment delay. *Id.* After considering the facts of that case, the Ninth Circuit concluded that the defendant Van Poyck had "not satisfied his burden of proof" and held that his statements had been properly admitted. *Id.* at 290. Moreover, post-*Corley* courts have similarly concluded that the burden of proof is on a defendant to show a presentment violation. *See United States v. Boche-Perez*, 755 F.3d 327, 336 (5th Cir. 2014) ("The defendant has the burden of demonstrating a *McNabb–Mallory* violation"); *United States v. Hector*, No. 1:12-CR-183-JEC-JSA, 2013 WL 2898078, at *8 (N.D. Ga. Jan. 29, 2013), report and recommendation adopted in part, rejected in part, No. 1:12-CR-183-JEC-JSA, 2013 WL 2898099 (N.D. Ga. June 11, 2013) ("Several courts have held that the burden of demonstrating an unreasonable delay in presentment rests with the Defendant."); s*ee also Miller v. United States*, 396 F.2d 492, 496 (8th Cir. 1968) ("The burden of showing unreasonableness rests on the defendant."); *Tillotson v. United States*, 231 F.2d 736, 738 (D.C. Cir. 1956) ("[T]he burden of showing unreasonableness of delay in arraignment rests upon the defendant").

Accordingly, the Court will follow *Van Poyck* and find that the Defendant bears the burden of proof of showing an unreasonable delay.

**D.     Unreasonable Delay**

**1.     Legal Standard**

In considering whether a delay was unreasonable or unnecessary, the Court considers whether the delay was of a "nature to give opportunity for the extraction of a confession." *United States v. Garcia-Hernandez*, 569 F.3d 1100, 1106 (9th Cir. 2009).  The Ninth Circuit has been "careful not to overextend *McNabb–Mallory's* prophylactic rule in cases where there was a reasonable delay unrelated to any prolonged interrogation of the arrestee." *Id.*

The Ninth Circuit has previously identified three categories that can constitute reasonable delay. *Valenzuela-Espinoza*, 697 F.3d at 751-52.  First, delay for humanitarian reasons is reasonable. *Id.* (citing *United States v. Redlightning*, 624 F.3d 1090, 1109 (9th Cir. 2010) (allowing defendant to retrieve medication)).  Second, "delays due to the unavailability of government personnel . . . necessary to completing the arraignment process" are also reasonable. *Id.* (citing *United States v. Liera*, 585 F.3d 1237, 1242 (9th Cir. 2009)).  Third, delays necessary to determine whether a suspect should be criminally charged are reasonable. *Id.* (citing *Garcia-Hernandez*, 569 F.3d at 1106)).

**2.     Processing Delays Prior to First Interrogation**

Here, the delay in Defendant's presentment to the magistrate judge was not unreasonable as it was the combined result of a shortage of government personnel necessary to complete the arraignment process, the need to determine what criminal charges were appropriate under rapidly changing circumstances, and delay resulting from the Southern District of California's MCC booking procedures.

To begin, any delay up until Mr. Meza-Gonzalez's first interrogation at approximately 12:40 PM on August 1, 2017, was justified by the need to determine criminal charges and a shortage of resources in processing the group of six aliens.  Mr. Meza-Gonzalez's group of six detainees were apprehended at approximately 6:00 AM. Dkt. No. 66-6 at 2.  According to Agent Garduño, it takes approximately 30 minutes to 45 minutes to transport the detainees from Zone 22—where the group was apprehended—to

the nearest road, and a further 45 minutes to an hour to transport the group to Brown Field Station. Vol. I at 17-18. Once at Brown Field Station, the processing agents needed to process each alien through an extensive process that included biographical questioning, fingerprinting, and database checks through the SDlaw criminal history database and PCQS immigration database. Vol. I at 20, 45-47. Agent Garduño estimated that the entire booking process for a group of six individuals would take, at a minimum, between four to five hours. Vol. I at 16. Consequently, these delays attributable to processing do not constitute unreasonable delay. *See Garcia-Hernandez*, 569 F.3d at 1106.

Moreover, the agents spent time during this initial processing to determine whether any foot guides were present in the group, a process necessarily relevant to the determination of whether alien smuggling charges should be brought. Agent Garduño asked simple biographical-type questions to the material witnesses in order to determine whether there may have been a foot guide within the group. Vol. I at 18-19. Even after the border patrol agent's determination that Defendant may have been a foot guide, Agent Garduño required time in order to prepare the necessary materials and to discuss with his supervisor whether to pursue a criminal prosecution or a removal proceeding. *See* Vol. I at 20.

Furthermore, significant additional processing by the Prosecutions Unit was required before a case could be presented to a duty prosecutor for approval for prosecution. Agent Ibarra, a member of the Prosecutions Unit, testified that her team conducted more extensive record checks than those performed at the border patrol station by the desk officer, which included research regarding PACER and the PCQS database not commonly used by desk officers at the time of Mr. Meza-Gonzalez's arrest. Vol. III at 299-300. In addition, identification of a foot guide was a necessary component for a Section 1324 prosecution. Vol. III at 337. Agent Ibarra observed that Section 1324 investigations involve a "long, complex process" and that additional background checks and forms were required in order to prepare a case for a prosecution decision by the duty AUSA. Vol. III at 320. Consequently, the delay required to make a proper charging decision did not

constitute unreasonable delay. *See Garcia-Hernandez*, 569 F.3d at 1106.

### 3. Delay Due to Discovery that Defendant Was Foot Guide for the Deceased

The facts also show that a final charging decision had not yet been made at the time of Defendant's first interrogation, and that the decision was complicated by developments —after Defendant's first interrogation—indicating that Defendant may have been the foot guide for Mrs. Mondragon and her deceased husband. Agent Meyer, a member of the Station Intelligence Team that provides support for out-of-the-ordinary cases, testified that he first became involved in the case after the discovery that defendant had potentially guided a group involving a person who had died. Vol. I at 106. It took approximately 1.5 hours for members of the Homeland Security Investigations team to gather for a half-hour meeting to discuss an investigative plan. Vol. I at 108-109. None of these facts suggest any unreasonable delay—these steps were taken as a direct result of developing circumstances that drastically increased the seriousness of the case and potential criminal charges that were being considered against Mr. Meza-Gonzalez. Moreover, this delay was not "of a nature to give opportunity for the extraction of a confession." *See Mallory*, 354 U.S. at 455. Accordingly, the delay following the first interrogation until the second interrogation was reasonable because it resulted from the need to determine the appropriate criminal charges. *See Garcia-Hernandez*, 569 F.3d at 1106.

Moreover, a significant portion of this delay arose from the need to wait for a fluent Spanish speaker, Agent Cuevas, to interview Ms. Mondragon and later, Mr. Meza-Gonzalez, in assessing what criminal charges were supported in this complex case. Vol. II at 204. Agent Cuevas testified that his Spanish speaking ability was better than that of, for example, Agent Meyer. Vol. II at 227. Given the death of a member of the group, it was important to have a fluent Spanish speaker who could understand colloquialisms and slang better than a regular agent. Vol. I at 110. Further, Agent Cuevas's Spanish-speaking abilities allowed him to speak about delicate issues—such as the death of Mrs. Mondragon's husband—appropriately. Vol. II at 227. Accordingly, this part of the delay

was attributable to the need to wait for a fluent Spanish speaker to properly investigate the situation. *See United States v. Gamez*, 301 F.3d 1138, 1143 (9th Cir.2002) (holding that a day-and-a-half delay was reasonable due to the unavailability of Spanish-speaking federal agents). In addition, Agent Cuevas spent several hours performing research and developing a line of questioning in order to ascertain and properly investigate the circumstances that led to the death of Mrs. Mondragon's husband. Vol. II at 228.

### 4. Delay Due to MCC Procedures

Finally, any remaining delay *after* Defendant's second interrogation is the result of the unavailability of the magistrate and the standard MCC booking procedures which multiple courts have accepted as reasonable delay under Rule 5. Agent Ibarra testified that an impediment to immediate presentment to a magistrate judge is whether a booking window could be secured with the Metropolitan Correctional Center ("MCC"). Vol. 328. At that time, Southern District of California procedure required that individuals be first brought to the MCC prior to their arraignment. Vol. III at 329. Three slots are available for 9:00 AM; 12:30 PM; and 5:30 PM. Vol. III at 333. Individuals brought in during the 9:00 AM and 12:30 PM windows can be arraigned the same day.

Here, Agent Ibarra testified that the Prosecutions Unit called the MCC at 2:40 PM in the afternoon on August 1, 2017. Vol. III at 344. The MCC provided the first available window at 9:00 AM the next day on August 2, 2017. Vol. III at 346. This resulted in Defendant being arraigned on the afternoon of August 2, 2017 during the first available magistrate judge's window at 2:00 PM. These procedures are in accord with the standard procedures of the Southern District of California and constitute reasonable delay.

The Southern District of California's General Order 605 requires screening for tuberculosis ("TB") to ensure the "safety of the MCC staff, the inmates, and the community." *See United States v. Lauina*, 2016 WL 1573195, at *2 (S.D. Cal. 2016). In 2010, the MCC reported the highest incidence rate of TB for all facilities in the Bureau of Prisons. *Id.* As a result of this screening, x-rays need to be read by a radiologist. *Id.* X-rays received in the morning—from inmates booked at the 9:00 a.m. window—are read so

that the detainees can be brought to court by 2:00 p.m. *Id.* The *Lauina* court criticized the inability of the government to arraign defendants booked into the MCC at the 12:30 p.m. window on the same day as their booking. *See Lauina*, 2016 WL 1573195, at *6. Here, defendant's case involves the 9:00 a.m. window which allows for same-day presentment and was not found to be unreasonable in *Lauina*. Given that the government obtained the first available MCC booking window for Defendant at 2:40 PM, any delay resulting from the MCC's booking procedures and magistrate judge availability constitutes reasonable delay. *See United States v. Portocarrero-Angulo*, No. 3:16-CR-02555-BEN-01, 2017 WL 3283856, at *8 (S.D. Cal. Aug. 1, 2017) ("Such screening shall be completed expeditiously and to avoid unnecessary delay in the detainee's appearance before the Court as required by Federal Rule of Criminal Procedure 5. See S.D. Cal., Gen Order No. 605. The need to complete this screening makes the delay between Defendant's arrival in San Diego on Friday afternoon and his presentment the next Monday reasonable."); *Lauina*, 2016 WL 1573195, at *6 (holding that the 12:30 window should be expedited to allow for defendants scheduled at 12:30 p.m. to be arraigned before the end of the Magistrate Judge's afternoon calendar but declining to address the 9:00 a.m. window).

### E. Conclusion

The above facts demonstrate that any delay in presenting Defendant was based upon staffing shortages, the charging decision process, and processing protocols at the MCC, and was not caused by a desire to interrogate Meza-Gonzalez further. Ultimately, Defendant has not met his burden to show that the delay by the government in presenting Defendant to a magistrate judge was unreasonable. *See Van Poyck*, 77 F.3d at 290 ("Van Poyck has not satisfied his burden of proof and his statements were properly admitted."). Accordingly, the Court will **DENY** Defendant's Motion to Suppress on this basis.

//

//

//

## IV. Motion to Suppress: Voluntariness

Confessions must be made voluntarily. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). A confession is involuntary if coerced either by physical intimidation or psychological pressure. *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981). Courts evaluate a totality of circumstances to determine voluntariness including several factors such as "the youth of the accused, his intelligence, the lack of any advice of the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Haswood*, 350 F.3d at 1027. The totality of the circumstances contains no "talismanic definition" of voluntariness. *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973). "In determining whether a defendant's confession was voluntary, the question is whether the defendant's will was overborne at the time he confessed." *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) (en banc).

### A. Food

Defendant argues that his statement was involuntary because he was not given sufficient food to satiate him even though he held been held for over 24 hours at the Border Patrol station. Dkt. No. 61-1 at 13. This claim is not supported by the evidence presented during the evidentiary hearing. Here, the Government provided a subject activity log for Mr. Meza-Gonzalez. Prior to his second interrogation, Defendant was fed at least three burritos at 7:56 AM, 10:38 AM, and 4:30 PM.[5] *See* Ex. 4. Moreover, Defendant was provided with juice and/or crackers at 7:56 AM, 10:08 AM, and 1:49 PM. *See id.* Desk Officer Povoli testified that the burritos were generally obtained from Costco and were usually bean and cheese burritos, while sometimes they were beef burritos. Vol. III at 291. Furthermore, if detainees were particularly hungry they could request additional burritos. Vol. III at 291-92. There is also no indication that Mr. Meza-Gonzalez refused the food as

---

[5] According to Desk Officer Povoli, these records are usually inputted within 10 or 15 minutes of the event occurring. Vol. III at 369-370.

no entries in the subject activity log indicate that the "subject refused food." Vol. III at 289.

Border patrol officers are required to provide food to adults every six to eight hours. Vol. III at 273. The evidence presented shows that Mr. Meza-Gonzalez was fed at more frequent a rate than even that required by the border patrol's internal policies. *See* Vol. III at 273; *id* at 369 (stating that Defendant was provided "with food more regularly, even, than the standard policy."). The evidence clearly shows that Defendant was not deprived of food such that his confession was rendered involuntary.

### B.   Temperature

Next, Defendant argues that he was kept in a room so cold that it felt like punishment. Dkt. No. 61-1 at 13. Desk Officer Carbajal testified that one of his duties was to check the temperature of a room by using a temperature gun that shoots a laser to obtain a temperature reading of the room and compare that reading to certain temperature guidelines on a "detention module" system used to keep track of detainees. Vol. III at 254, 257. Desk Officer Pavoli testified that the acceptable temperature range was between 66 to 80 degrees. Vol. III at 364. Furthermore, desk officers also reference a thermostat box near their desk to make sure the temperature is correct. Vol. III at 258. According to Desk Officer Carbajal, in his two years of experience as a desk officer, the temperature had never fallen above or below the guideline range. Vol. III at 262-63. Moreover, the border patrol agents also perform roll call in-person evaluations of the detainee rooms and Mylar "space blankets" are provided if they are requested if certain individuals are colder than others. *See* Vol. III at 264, 367. Desk Officer Pavoli testified to having once given a detainee four blankets. Vol. III at 372. Agents endeavor to keep the cells at 73 degrees. Vol. III at 364. Under these facts, there is no evidence that the environment was so cold as to render Mr. Meza-Gonzalez's confession involuntary.

### C.   Sleep

Finally, Defendant also argues that he was unable to sleep and was so exhausted during his interrogation that his confession was rendered involuntary. Here, the evidence shows that Defendant was able to sleep, and that in any event, any sleep deprivation did

not rise to a level of exhaustion that could render his confession involuntary.  Pertinently, Defendant's second interrogation begins with the following interaction (translated from Spanish):

> Defendant: Here?
> Agent 1: Have a seat. Stretch. Wake up. Remove your eye boogers. Did you have a nice nap?
> Defendant: Yes.
> Agent 1: How long were you sleeping in there?
> Defendant: I don't know. [chuckles]
> Agent 1: You don't even know . . .

Dkt. No. 66-11 at 5. As this conversation makes clear, Defendant was able to sleep prior to his second interrogation and consequently he lacks a factual basis to assert that his confession was involuntary because of lack of sleep.

The Court has also independently reviewed the videotaped interrogation and concludes that Mr. Meza-Gonzalez's demeanor and behavior during the interrogation do not evince any indication that his confession was the result of a lack of sleep. *See* Exhibit 9.  Nor does the video support any contention that his confession was the product of a lack of food or cold temperature. Accordingly, the Court will **DENY** Plaintiff's Motion to Suppress based on voluntariness.

## CONCLUSION

The Court **DENIES** Plaintiff's Motion to Suppress.[6]  A status hearing as to this case shall be held on August 8, 2018 at 4:30 PM.

---

[6] Defendant's initial motion to suppress also raised a motion to sever counts.  Dkt. No. 61-1 at 14. Defendant has not addressed this motion to sever in any subsequent briefing or during any of the three days of evidentiary hearings.  Defendant also did not file any supplemental briefing after the conclusion of the evidentiary proceedings.  To the extent Defendant continues to seek to sever the counts that request is **DENIED** as any prejudice to Defendant of joining Count 1 from Counts 2-8 is outweighed by the interests of judicial economy**.**  *See United States v. Johnson*, 820 F.2d 1065, 1070 (9th Cir. 1987) (affirming denial of severance request where "all of the evidence of the separate count[s] would be admissible" at both trials).

17-cr-2552-GPC

**IT IS SO ORDERED.**

Dated: August 7, 2018

Hon. Gonzalo P. Curiel
United States District Judge

17-cr-2552-GPC